

COUNTY OF BALDWIN            )
                             ) ss:
STATE OF A L A B A M A       )

## AFFIDAVIT OF MARILYN A. KAYE-KIBBEY

1. I am Marilyn A. Kaye-Kibbey, over 21 years of age, and of sound mind and body. I have personal knowledge of the matters contained in this Affidavit, and would be competent to testify thereto. In my professional life I have also been known as "Marilyn Kaye."

2. I am presently not employed. Up until the fall of 2003, I was a registered representative of Raymond James Financial Services, Inc. ("Raymond James"), a broker/dealer. I was also the sole member and resident agent of Summit Managed Investments, LLC ("Summit"), a Michigan limited liability company.

3. While a registered representative of Raymond James and sole member of Summit, I also had an employment agreement with Lucasse, Ellis, Inc. ("LEI"). The President and majority owner of LEI until I terminated my relationship with LEI was Rodney Ellis. Throughout this time period, Mr. Ellis was a registered representative of one or more affiliates of the Lincoln Financial Group ("Lincoln").

4. I have extensive experience working with Rodney Ellis since approximately 1975. Over that time, I have had hundreds of in-person, telephonic, and e-mail communications with Mr. Ellis. I have always worked with Mr. Ellis in the same physical office space, at various locations in and around Grand Rapids, Michigan.

## My Relationship with Lincoln Financial Group

5. From approximately 1992 until March 2002, I was an agent and registered representative for Lincoln, while employed by LEI. LEI sold principally variable annuities, life insurance, mutual funds, and other investments.

6. For the entire time that I was employed by LEI, Rodney Ellis, as President and majority owner of LEI, was my boss. As such, Rodney Ellis was in a position to terminate (fire) me at any time. I therefore felt that I had to do what Rodney Ellis told me to do.

7. As part of my agent contract with Lincoln, I understood that I was not permitted to offer or sell insurance polices, variable annuities, or other investments that were not offered or approved by Lincoln.

8. My responsibilities at LEI included general office management, maintaining books and records, handling client calls, and supervising office staff. Rodney Ellis

1

supervised and directed activities in these areas. In other words, I took orders from Rodney Ellis.

9. My compensation at LEI was in the form of a salary set by Rodney Ellis. From June 2000 when my husband retired, through the termination of my employment with LEI and Summit, we were dependent upon my income from LEI and Summit for our livelihoods.

<u>Rodney Ellis' Fraud Regarding Henry Ford Health Systems Employee Status</u>

10. In the mid-1990's, Rodney Ellis directed me and other LEI staff to obtain from Lincoln an "Alice Report" for the employees of the Henry Ford Health System who participated in "Plan 1" variable annuities at Lincoln. This data showed the customer name, account number, and account value.

11. Rodney Ellis directed me and other office staff to compare the Lincoln customers on this list with an "A-Roll" billing list, which showed which Henry Ford Health System employees participating in Lincoln's Plan 1 variable annuities were continuing to actively contribute funds to a Lincoln variable annuity.

12. Rodney Ellis directed that we compare the "Alice Report" with the "A-Roll" billing list, in order to identify those Lincoln variable annuity customers who were doctors at Henry Ford Health System that were not actively contributing to their Lincoln variable annuities. He directed that I and other office staff fill out forms indicating that these Lincoln customers had terminated their employment with Henry Ford Health System. He sometimes signed these forms himself, and other times instructed me or other LEI staff to sign his name, and to submit the signed forms to Lincoln.

13. Based upon my close involvement in the LEI office with the Henry Ford Health System group I knew, and Rodney Ellis indicated that he knew, that virtually none of the individuals for whom he directed that termination of employment forms be filled out in this manner and submitted to Lincoln had, in fact, terminated their employment at Henry Ford Health System, and that neither Mr. Ellis nor LEI had been given any indication from the employee or Henry Ford Health System that the Lincoln customer had terminated his or her employment.

14. Based upon my conversations with Rodney Ellis and my work with the Henry Ford Health System group, I learned that Mr. Ellis had arranged with Lincoln to receive commissions totaling 35 basis points of the total assets of former Henry Ford Health System employees, whereas Mr. Ellis received no, or minimal, trailing commissions for continuing Henry Ford Health System employees who were not actively adding funds to their Lincoln variable annuity accounts. Thus, by transferring these static Lincoln variable annuity investors to "terminated" status, Mr. Ellis effectively increased his commissions from Lincoln by approximately 35 basis points of the asset value transferred to terminated status.

15. I estimate based upon my personal knowledge that at least 200 "A-Roll" Henry Ford Health System employees were transferred in the Lincoln system to terminated status by direction of Rodney Ellis who had not, in fact, terminated their employment with

2

Henry Ford Health System at the time. I further estimate based upon my personal knowledge that over $10 million in assets were transferred to terminated employee status, resulting in additional annual commissions to Mr. Ellis on the order of at least $350,000.

### Rodney Ellis' Plan To Transition His Clients To Raymond James

16. In approximately late 2001, Rodney Ellis instructed me to "retire" as a Lincoln agent and registered representative. He told that he would establish a new business entity separate and distinct from LEI for the purpose of selling investments offered or approved by Raymond James, including variable annuities and mutual funds. He told me that he would provide the funds to finance this business entity. He directed me to become an agent and registered representative of Raymond James to assist him in accomplishing this purpose. He selected counsel, approved articles of incorporation, and organized and created Summit for this purpose.

17. Raymond James is a competitor of Lincoln.

18. Rodney Ellis further explained to me that it was his plan and intention to move his clients from Lincoln to Raymond James, and to himself eventually become formally associated with Raymond James. He explained that Raymond James paid higher commissions than Lincoln as one of the primary reasons for his decision to transition his clients to Raymond James.

19. Attached as Exhibit 1 to this affidavit is a true and correct copy of an e-mail sent by Rodney Ellis on January 19, 2003, to Howard F. Cook, a Lincoln customer, responding to a communication from Mr. Cook about me and advising him in part that "Marilyn is still with us . . . in a new business unit. Marilyn opened and set up a Raymond James office. We needed a dimension that we couldn't get from the Lincoln Financial . . . . We are doing a lot of managed accounts and need this improved sophistication."

20. At no time did I initiate or conceive of the idea of my becoming associated with Raymond James. On the contrary, I became a registered representative of Raymond James at the direction and instruction of Rodney Ellis. While I did not desire to terminate my relationship with Lincoln at that time, I did so at the direction of Rodney Ellis. I felt that if I disobeyed his directive in this regard, that he could terminate my employment at LEI, and that I would loose the compensation that my husband and I relied upon for our livelihood. I felt, therefore, that I had not choice but to do as Rodney Ellis directed.

21. Pursuant to the instructions of Rodney Ellis, I became the sole member of Summit. Mr. Ellis, directly or through LEI or other entities, loaned Summit approximately $60,000 in start-up financing.

22. Rodney Ellis obtained office space for both LEI and Summit at 4123 Embassy Drive, S.E., Kentwood, Michigan, and set up Summit's offices at that location.

23. While I was in this office space, LEI operated, in effect, as a joint Lincoln and Raymond James office. Lincoln and Raymond James client files were readily accessible, in paper and electronic form, to everyone in the combined office, including myself, Rodney Ellis, and all of the staff of Summit and LEI.

24. While I was affiliated with Raymond James, Rodney Ellis routinely offered his clients both Lincoln and Raymond James insurance policies, annuities, and other investments. Moreover, he frequently transitioned his Lincoln clients over to Raymond James, using me and Summit as the vehicle for doing so. For example, he would routinely call on customers with both Lincoln and Raymond James account forms in his briefcase. He would also use client questionnaire forms, fill in the questionnaire during his meeting with the customer, and then have me or someone else in the office use the information on the questionnaire to fill in a new account form for the customer at Raymond James, incorporating data from the Lincoln files of that customer.

25. I estimate, based upon my personal knowledge and experience at Summit and LEI, that in excess of 95% of the assets managed by Summit were Lincoln customers of Rodney Ellis that he moved over to Raymond James while he was still an agent and registered representative if Lincoln. These assets totaled in excess of $10 million.

Ellis' Efforts To Conceal His Activities From Lincoln

26. Rodney Ellis took a number of steps to conceal his sale and promotion of Raymond James annuities, insurance policies, and other investments including stocks and mutual funds, from Lincoln. He also directed others in the LEI offices (including myself) to do the same. For example, he:

- Listed me as the account representative for his clients on all new Raymond James account forms;

- Deleted entries in LEI's financial books and records reflecting both payments from LEI to Summit to finance Summit's startup costs, and payments from Summit to LEI to repay such loans, and told me that this was to avoid detection of this activity by Lincoln;

- Directed that e-mail accounts outside the Lincoln e-mail system be set up, and instructed that intra-office e-mail, including but not limited to e-mail relating to moving Lincoln customers to Raymond James, not be sent on the Lincoln e-mail system;

- Directed that correspondence and forms that historically had been retained in Lincoln customer files be scanned to computer hard drives, and that the paper documents be destroyed. The image files of these scanned documents were routinely placed on an external hard drive, and kept off-site.

- Told Lincoln auditors that the pared-down paper customer files in the file cabinets at LEI's offices were the only client records maintained by LEI. He did not tell them

4

about or make available the scanned image customer files kept on external hard drives off-site;

- Arranged with Scott Dalley, who performed computer and network services for LEI and Mr. Ellis, to store a backup or copy of LEI hard drives, including Lincoln customer data, with a friend of Mr. Dalley's in Indianapolis, Indiana. To my knowledge, information and belief, this individual in Indianapolis had no affiliation with Lincoln;

- Instructed office staff to pull the window shades down all day long to discourage an unannounced visit from Lincoln auditors;

- Directed office staff to leave the premises in advance of a Lincoln audit and wait for his "all clear" signal to avoid questioning by the Lincoln auditors;

- Caused, in approximately Spring of 2003, the "notes" field of the Lincoln CDS client database to be "exported" to a different software program (Microsoft Word), and subsequently erased, such that the Lincoln CDS client database software in use at LEI no longer contained client-specific notes. Rodney Ellis worked with Scott Dalley to accomplish this. Prior to this time, we had been directed by Mr. Ellis to record notes of Lincoln client communications in the CDS database. He indicated that this change was to prevent Lincoln's auditors from being able to review client-specific notes that might pertain to Raymond James activity (e.g., instructions for moving the client to a Raymond James account or product);

- Again working with Scott Dalley, implemented a "kill button" capability in the LEI computer system. Rodney Ellis told me that the purpose of this "kill button" function was so that in case Lincoln auditors reviewed LEI's computer data and records, he could contact Mr. Dalley and have Mr. Dalley, from a remote computer, issue commands to destroy sensitive data relating to Lincoln's customers or former customers. My understanding is that this "kill button" capability can be used to remotely destroy the centralized customer notes file, which includes historical notes relating to Lincoln customers.

- Maintained until approximately the summer of 2003 a storage shed at Bouma storage on the northwest side of Grand Rapids, Michigan, where he stored overflow files and records of LEI, including files relating to Lincoln customers. He told me that he stopped renting this storage shed in the summer of 2003, and moved some of the documents that had been stored their to his basement.

\* \* \*

about or make available the scanned image customer files kept on external hard drives off-site;

- Arranged with Scott Dalley, who performed computer and network services for LEI and Mr. Ellis, to store a backup or copy of LEI hard drives, including Lincoln customer data, with a friend of Mr. Dalley's in Indianapolis, Indiana. To my knowledge, information and belief, this individual in Indianapolis had no affiliation with Lincoln;

- Instructed office staff to pull the window shades down all day long to discourage an unannounced visit from Lincoln auditors;

- Directed office staff to leave the premises in advance of a Lincoln audit and wait for his "all clear" signal to avoid questioning by the Lincoln auditors;

- Caused, in approximately Spring of 2003, the "notes" field of the Lincoln CDS client database to be "exported" to a different software program (Microsoft Word), and subsequently erased, such that the Lincoln CDS client database software in use at LEI no longer contained client-specific notes. Rodney Ellis worked with Scott Dalley to accomplish this. Prior to this time, we had been directed by Mr. Ellis to record notes of Lincoln client communications in the CDS database. He indicated that this change was to prevent Lincoln's auditors from being able to review client-specific notes that might pertain to Raymond James activity (e.g., instructions for moving the client to a Raymond James account or product);

- Again working with Scott Dalley, implemented a "kill button" capability in the LEI computer system. Rodney Ellis told me that the purpose of this "kill button" function was so that in case Lincoln auditors reviewed LEI's computer data and records, he could contact Mr. Dalley and have Mr. Dalley, from a remote computer, issue commands to destroy sensitive data relating to Lincoln's customers or former customers. My understanding is that this "kill button" capability can be used to remotely destroy the centralized customer notes file, which includes historical notes relating to Lincoln customers.

- Maintained until approximately the summer of 2003 a storage shed at Bouma storage on the northwest side of Grand Rapids, Michigan, where he stored overflow files and records of LEI, including files relating to Lincoln customers. He told me that he stopped renting this storage shed in the summer of 2003, and moved some of the documents that had been stored their to his basement.

\* \* \*

27. I have provided this Affidavit voluntarily, under no duress, and with no promise of remuneration of any type, directly or indirectly.

28. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief and that this declaration was executed by me on April 7, 2004.

_____
Marilyn A. Kaye-Kibbey

SUBSCRIBED AND SWORN TO BEFORE
me in Orange Beach, Alabama, this 7th
day of April 2004.

_____
Notary Public
Expires 10/3/06

6

| | |
|---|---|
| Subj: | **Marilyn Kaye** |
| Date: | 01/19/2003 10:14:50 PM Eastern Standard Time |
| From: | Ellisrod |
| To: | HowardFCook |

Dear Howard,

How wonderful to hear from you and your kind words for Marilyn. You'll be glad to hear that Marilyn is still with us...in a new business unit. Marilyn opened and set up a Raymond James office. We needed a dimension that we couldn't get from the Lincoln Financial. The main dimension is research (you might notice that Raymond James wins the stock picking contest in the Wall Street Journal each year). Also, the computerized record keeping and executions. We are doing a lot of managed accounts and need this improved sophistication.

By the way, Gordon is well and in Florida. He plays golf 4 days a week and stays in the low 80's. We talk a lot and I will pass along your message.

Rod Ellis

EXHIBIT 1

Thursday, January 23, 2003 America Online: Ellisrod